RODNEY H. DIXON
29635 Troon Court
Murrieta, California 92563
(805) 768-4474
dubailandlegend@yahoo.com
Plaintiff in Pro Per





## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Rodney Herachio Dixon

               Plaintiff

      Vs.

NPG Music Publishing,LLC,
NPG Records, Inc., The Estate
of Prince Rogers Nelson,
Does 1 – 10}

            Defendants.

CASE NO. **CV17 -01529** DMG (JPRx)

**COMPLAINT FOR:**

**(1) COPYRIGHT INFRINGEMENT**

**(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(3) BREACH OF CONTRACT**

     **DEMAND FOR JURY TRIAL**

Rodney Herachio Dixon ("Mr. Dixon") avers as follows:

### PRELIMINARY STATEMENT

1. Mr. Dixon is a musician and songwriter and producer of musical compositions and recordings and related entertainment products.  Mr.

Dixon's musical compositions have been featured on albums released by the artist Prince Rogers Nelson ("Prince"). Mr. Dixon's creative works have been featured on albums titled "Purple Rain", "Around the World in a Day", "Sign O' The Times", "Emancipation", and a host of songs in the "Vault,' in addition to all other musical compositions performed by Prince listed as "$ by Prince Rogers Nelson et al" (collectively, the "Dixon Songs"). By this action, Mr. Dixon seeks to put a stop to, and obtain redress for, the willful and deliberate conduct of Defendant NPG Music Publishing, LLC, NPG Records, Inc., and the Estate of Prince Rogers Nelson, and those working in concert with them.  The Estate of Prince Rogers Nelson ("the Estate"), in collaboration with special administrator's, personal administrator(s), and a team of attorneys, have been instrumental in crafting legal defensives that misrepresent the claims of Mr. Dixon, that are designed to harm Mr. Dixon from collecting on his contract with decedent Prince Rogers Nelson, while marketing, distributing, maintaining, and updating, for profit, the Dixon songs that are exclusively owned by Mr. Dixon after the death of Prince Rogers Nelson.  More precisely, the Estate has contracted the Dixon songs to third parties that capitalize on the Dixon songs without compensation to Mr. Dixon and without Mr. Dixon's permission.

2.  The Estate have caused, and are continuing to cause, massive harm to Mr. Dixon. Mr. Dixon's legacy and business depends upon his contract payment from the Estate of Prince Rogers Nelson, and Mr. Dixon's ownership of his creative works and joint-works monetized by the late Prince Rogers Nelson. The misrepresentations by the Estate regarding Mr. Dixon's copyright contract claims are actions that hinder, delay, and destroy the integrity of Mr. Dixon's name, further damaging his reputation and opportunity for a financially productive future as a songwriter and producer, while diverting revenue from Mr. Dixon to Defendants.  Resulting from the Estate's conduct, Mr. Dixon has lost millions in revenue and in consumer goodwill with the possibility of lost revenue of at least a billion dollars.  Meanwhile, the Estate have been massively and unjustly enriched at Mr. Dixon's expense, having received millions of dollars in fees and other considerations while contracting with others that gain revenues from the exploitation of the Dixon songs.

3.  In exploitation of the Dixon songs, the Estate has engaged in numerous acts of copyright infringement.  The Estate also has knowingly and intentionally violated the license Prince entered with Mr. Dixon, to which Prince obtained access to the Dixon songs that expired upon Prince's death; and the Estate

has authorized others to do the same.  The Estate knows that their conduct is unlawful and is causing ongoing harm to Mr. Dixon.

4. The Estate has no credible defense to their unlawful conduct outside of misrepresentations and void of Federal and Copyright Law.  Mr. Dixon is entitled to monetary damages, injunctive and other equitable relief, and punitive damages against the Estate and those working in concert with them.

## I. <u>JURISDICTION</u>

5. This is a civil action seeking damages and injunctive relief under the Copyright Act, 17 U.S.C. § 101 et seq., and under the laws of the State of California.

6. This Court has subject matter jurisdiction over Mr. Dixon's claims for copyright infringement pursuant to 28 U.S.C. §§ 1331 and 1338(a). Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Mr. Dixon's state law claims for breach of contract and intentional interference with contract in that they are so related to Mr. Dixon's claims under the Copyright Act as to be part of the same case or controversy.

7. This Court has personal jurisdiction over Defendants, including because Defendants have engaged in, contributed to, and induced the infringing conduct at issue within the United States and the State of California and among other things, Mr. Dixon's contract with Prince took place in Los

Angeles, California. Furthermore, Mr. Dixon's creative works are forever

inserted into the master recordings and intellectual properties administered

by NPG Music Publishing, LLC, a California LLC, and NPG Music, Inc., a

former California LLC. The Estate have purposefully directed their activities

at the United States and at California. Mr. Dixon additionally avers that,

among other things, (a) each of the Defendants or their respective agents are

doing or have been doing business continuously in the State of California

and this District, (b) a substantial part of the wrongful acts committed by

Defendants, and each of them, have occurred in interstate commerce, in the

State of California, and in the Central District of California, (c) Defendants

know that the damages and other harmful effects of Defendants' infringing

activities occur in the United States and primarily in California, where Mr.

Dixon resides, and has his principal place of business, and where decedent

operated NPG Music, Publishing, LLC and NPG Records, Inc., (d)

Defendants' infringing activities are part of a joint, international effort

among defendants conducting business within the United States and outside

the United States.

## II. VENUE

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400

because this is a judicial District in which a substantial part of the events

giving rise to the claims occurred, and/or in which Mr. Dixon's injury was suffered, and the main company for which the intellectual properties were held and administered is a California LLC.

### III.    PARTIES

9. Mr. Dixon is the creator and joint-creator of the Dixon songs with decedent Prince Rogers Nelson, and owner of all rights, title, and interest in the Dixon songs after the death of Prince Rogers Nelson. Mr. Dixon is a resident of the State of California. NPG Music Publishing, LLC is a California company. NPG Records, Inc. was a California company before being switched to the State of Minnesota after the death of Prince Rogers Nelson. The Estate of Prince Rogers Nelson is being administered by special administrators and personal representatives.

10. Mr. Dixon is informed and believes, and on that basis, allege, that NPG Music Publishing, LLC NPG Records, Inc., and the Estate of Prince Rogers Nelson, and are defendants personally represented by Comerica Bank and Trust N.A., whose legal representation is Frederickson & Byron, P.A., Attn. Joseph J. Cassioppi, 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402-1425. Mr. Dixon is informed and believes that NPG Music Publishing, LLC, NPG Music, Inc., and the Estate of Prince Rogers Nelson,

has been instrumental in exploiting the Dixon songs, including to provide authorization and contracts for such use.

11. The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as Does 1-100 inclusive, are unknown to Mr. Dixon, which has therefore sued said defendants by such fictitious names.  The defendants may include individuals whose real identities are not yet known to Mr. Dixon, but who are acting in concert with one another, in committing the unlawful acts alleged herein.  Mr. Dixon will seek leave to amend this complaint to state their true names and capacities once said defendants' identities and capacities are ascertained.  Mr. Dixon is informed and believes, and on that basis, avers, that all defendants sued herein are liable to Mr. Dixon because of their participation in all or some of the acts set forth in this complaint (all the defendants collectively are referred to herein as "Defendants").

12. Mr. Dixon is informed and believes, and on that basis, alleges, that always mentioned in this complaint, each of the Defendants was the agent of each of the other Defendants and, in doing the things averred in this complaint, was acting within the course and scope of such agency.

## IV.    STATEMENT OF FACTS
### The Dixon Songs

13. Mr. Dixon is a musician, songwriter, and producer of musical compositions, engaged in the business of songwriting.  Among the songwriting produced by Dixon, in collaboration with the creative skills of Prince, are some of the most popular songs in the world, including but not limited to the incredibly popular albums "Purple Rain", "Around the World in a Day", "Sign O' The Times", and "Emancipation", and a host of songs in the "Vault", and those listed in the copyright filing "$ By Prince Rogers Nelson et al," (collectively, the "Dixon Songs")

14. Since the establishment of Mr. Dixon as a songwriter with Prince in 1984, Mr. Dixon has become one of the world's most successful ghostwriters in music history. While the Dixon songs vary significantly in many respects, they share a significant common feature blending the life of these two men, and that the success of each man, rests in part on the Estate.

PURPLE RAIN

15. Purple Rain was released in 1984, and is one of the best-selling albums of all time. Purple Rain is a battle of sexuality and spirituality. This is a battle that is common to man from new believer to priest. Purple Rain brings the audience into this battle of the mind and clash of the ages.

16. Mr. Dixon blended rock and funk for this album. Prince wanted an album with sexuality as the main feature. Mr. Dixon wanted an album with spirituality as the main feature. The compromise produced Purple Rain. A blend of sexuality, spirituality, funk, rock and pop.

17. Purple Rain is the first album Mr. Dixon worked on with Prince and it became Prince's most successful.

## AROUND THE WORLD IN A DAY

18. Around the World in a Day was released in 1985. Around the World in a Day continued with the battle of sexuality and spirituality as the compromise of Prince's strong focus of sex and Mr. Dixon's strong focus of spirituality. Mr. Dixon's musical direction changed with less guitar emphasis and rock focus. Around the World in a Day brings together the Alpha and Omega, the Beginning and the End. Encompassing one full day – start to finish, as a life goes from birth to death.

19. Around the World in a Day is the second album Mr. Dixon work on with Prince.

## SIGN O' THE TIMES

20. Sign O' The Times was released in 1987. Mr. Dixon featured more computer programming in songs performed on Sign O' The Times. Spirituality took a prominent position v. sexuality in the song "The Cross."

Sign O' The Times represent the political expressions of Mr. Dixon and Prince.

21. Sign O' The Times is the third album Mr. Dixon worked on with Prince.

THE LAWSUIT

22. Although Prince and Mr. Dixon wrote songs together during the dark years of 1988 – 1993, these songs remained in the vault. In fact, Mr. Dixon sued Prince in court for Fraudulent Transfer of master recordings to Warner Bros. Records in 1994. Warner Bros. Records demurred to the action on October 12. 1994 [See **Exhibit A**].

23. After the Court accepted Proof of Service, both Defendants, Warner Bros. Records and Prince Rogers Nelson, SUBMITTED to Mr. Dixon's pleadings and the Court's ruling [See **Exhibit B**].

24. The court determined that Prince entered the contract instead of Warner Bros. Records. Warner Bros. Records was therefore dismissed from the action in 1995, but Prince was not dismissed [See **Exhibit C**].

25. Shortly thereafter, in 1995, Prince and Mr. Dixon extended the license for Prince's use of Mr. Dixon's creative works with $1 given for consideration for the agreement [See **Exhibit D**].

26. Dixon's lawsuit featured themes of Ancient Egypt, the Holy Bible creation story, inheritance from Abraham, etc. Mr. Dixon cast Prince and others into

character parts, but Warner Bros. Records declared a lack of understanding regarding the creative subject matter [See **Exhibit E**].

27. Prince wrote a letter to the world regarding his requested release from his contract with Warner Bros. Records, and his invitation to other artists to join him on this new path, NPG Records, in which Mr. Dixon accepted [See **Exhibit F**].

28. Although Warner Bros. Records admitted to a lack of understanding of Mr. Dixon's entertainment and spiritual concepts, Mr. Dixon did specify Prince's understanding. Thereafter, Prince and Mr. Dixon worked together on the Emancipation album that featured the same themes of Ancient Egypt, the Holy Bible creation story, inheritance from Abraham, etc. that Warner Bros. Records admitted to a lack of understanding. Emancipation was released after Prince's release from the Warner Bros. Records contract. Emancipation was released via NPG Records. [See **Exhibit G**].

EMANCIPATION

29. Emancipation was released in 1996 featuring the spiritual dawn of Prince Rogers Nelson from a slavery of sexuality and the entertainment industry to the start of a spiritual awakening.

30. Emancipation is the fourth album Mr. Dixon worked on with Prince.

## THE VAULT

31. The infamous vault contains never to be released music from Mr. Dixon and Prince. The 1994 lawsuit had a major focus on the vault. After both defendants (Prince and Warner Bros. Records) submitted to the pleadings and the ruling of the honorable Aurelio Munoz of the Los Angeles Superior Court, Prince and Mr. Dixon entered an extended license to use Mr. Dixon's creative works with deferred royalty payments therewith for the remained of Prince's life.

## $ BY PRINCE ROGERS NELSON ET AL

32. In 1995, Mr. Dixon filed in the Library of Congress, Copyright Office the lawsuit against Prince and Warner Bros. Records as featuring Mr. Dixon's creative works with spiritual content titled 'Merc Supertext: a handy manual for the serious student of spirituality' under the name Rameses America Mercury.  In 2016, three (3) months before Prince's death, Prince placed all songs he ever worked on, into a contract with NPG Music Publishing, LLC. In the contract, Prince disallowed any defendants from acting on his behalf regarding these musical compositions, and Prince filed the contract with NPG Music Publishing, LLC into the Library of Congress, Copyright Office titled "$ By Prince Rogers Nelson" as part of Merc Supertext [See **Exhibit H**].

## DIXON'S LICENSE AGREEMENT

33. Mr. Dixon verbally accepted Prince's verbal offer to license the Dixon songs without limitation for three (3) years beginning in the year 1982 for $1 million with an extension for nine (9) more years as part of the twelve (12) years, for $1 billion agreement that ending in the year 1994. The lawsuit was filed in 1994 with the implied license specified in which both defendants Warner Bros. Records and Prince Rogers Nelson SUBMITTED. In the year 1995, the Implied License was extended with Mr. Dixon acceptance Prince's $1 consideration to extend to Prince a lifetime license in 1995. Mr. Dixon notified the Estate of his termination of the license upon the death of Prince on April 21, 2016 [See **Exhibit I**].

## IMPLIED LICENSE AGREEMENT BETWEEN PRINCE AND MR. DIXON

34. The agreement between Prince and Mr. Dixon is regarding Mr. Dixon's creative works and joint-works created in collaboration with Prince, and initiated in the year 1982, and extended in the year 1995 for the remainder of Prince's life, that is construed by Copyright/Contract Law as an Implied License. The involved parties are Prince Rogers Nelson and Rodney Herachio Dixon.

35. In such a relationship, there is always a contract between the parties, which, if it concerns full transfer of ownership or the granting of an exclusive license, must be reduced to writing. However, if it is not a full transfer of ownership it need not be reduced to writing. 17 U.S.C. § 204(a) (2000).

36. Dixon did not grant full ownership to Prince and therefore no writing is mandated under the law. The implied license doctrine is, of course, not new. It is used in contract law to track the intent of the contracting parties for purposes of supplementing their agreement. *Kim Lewison, The Interpretation of Contracts* 152 (3d ed. 2004).

37. Nevertheless, various questions may arise as to the scope of the transfer, and the implied license doctrine is often used to resolve such questions by introducing additional terms into the contract, thereby granting the transferee collateral rights. *3 Nimmer, supra note 21*, § 10.1 0[c].

38. Therefore, the contractual interpretation or supplementation turns to judicial discretion as to the reasonable development of the contract. Such judicial choice might be expressed as an "interpretation" of the contract, or could be explained simply as granting of an implied license. This conclusion stems from the fact that extensive interpretation is given to an ambiguous term which both parties agreed to include. *3 Nimmer, supra note 21*, § 10. 1 0[B].

39. In *Desny v. Wilder* in a 1956 Supreme Court of California ruling "recognizing an implied contractual right to compensation when a writer submits material to a producer with the understanding that the writer will be paid if the producer uses the concept." In *Desny*, the extra element was "an agreement to pay for the use of the disclosed ideas." *Desny v. Wilder,* 299 P.2d 257 (Cal. 1956).

40. An implied agreement of payment for the use of a concept is a personal agreement between the parties and can only be effective between the parties. Such an agreement contrasts with and is unlike the public monopoly created by copyright law. A contract's purpose is to provide greater protection than is available under the Copyright Act. The Desny ruling allows creators to share their concepts and ideas "with the understanding that they are not being given away for free." The court noted that without the protection provided by Desny, there would be very little protection for some potentially valuable creative resources.

41. The implied license doctrine is deeply-rooted in intellectual property law. *Harrison v. Maynard, Merrill & Co.*, 61 F. 689, 690-91 (2d Cir. 1894). Contract law, whether through express or implied-in-fact contracts, is the most significant remaining state-law protection for literary or artistic ideas.

42. The court ruled that Plaintiff's breach of confidence claim also survives copyright preemption. The duty of trust of the confidential relationship is an extra element in the breach of confidence claim that makes it qualitatively different from a copyright claim. *Desny v. Wilder*, 299 P.2d 257 (Cal. 1956). Courts also consider various policy considerations that are aimed at giving effect to the intent of "reasonable parties." *Stem, supra note 24*, at 126; see also *Harrison v. Maynard, Merrill & Co.*, 61 F. 689, 690-91 (2d Cir. 1894).

43. In Desny, the California Supreme Court recognized that a writer and producer form an implied contract under circumstances where both understand that the writer is disclosing his idea on the condition that he will be compensated if it is used. 299 P.2d at 270. / 17 U.S.C. § 204(a).

44. The implied license is therefore not merely an instrument for tracking the subjective intent of the contracting parties, but rather a mechanism enabling the introduction of an objective standard of reasonability into the parties' relationship. *Stem, supra note 24*, at 126.

45. Implied License – "in an unwritten license which permits a party (the licensee) to do something that would normally require the express permission of another party (the licensor). Implied licenses may arise by operation of law from actions by the licensor, which lead the licensee to believe that it has the necessary permission."

46. Implied licenses, in their originating contract discipline, are usually divided into two categories based on their terms: (1) terms that parties probably had in mind but did not put in writing-in other words, terms that reflect the parties' subjective intentions-and (2) terms that the parties would probably have expressed if the issues had been brought to their attention. *LEWISON*, supra note 5, at 152. As one court, has explained, courts will "rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy." *S.O.S., Inc. v. Payday, In*c, 886 F.2d 1081, 1088 (9thCir. 1989).

## THE IMPLIED LICENSE INCLUDED CONSIDERATION

47. Dixon accepted $1 for consideration with deferred royalty payments for $1 billion therewith. Consideration for $1 is standard practice in the world of licensing: "For and in consideration of the sum of One Dollar to us in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged." *MemoryLink Corp. v. Motorola Solutions. Inc.*, (Fed. Cir. Dec. 5, 2014) (No. 2014-1186, N.D. Ill.).

48. There are variations of that clause - sometimes the sum of one dollar, sometimes five or ten dollars - but they are all designed for the same purpose: to remove the argument that the contract should fail for lack of

consideration. *MemoryLink Corp. v. Motorola Solutions. Inc.*, (Fed. Cir. Dec. 5, 2014) (No. 2014-1186, N.D. Ill.)

49. Citing decisions that reach back to the 19th century, the US court said, yes, nominal consideration *will* suffice to support a contract, including an invention assignment. *MemoryLink Corp. v. Motorola Solutions. Inc.*, (Fed. Cir. Dec. 5, 2014) (No. 2014-1186, N.D. Ill.)

50. Courts will not inquire into whether the consideration listed in the agreement is adequate, unless the amount is "so grossly inadequate as to shock the conscience." In this case, the amount of $1.00 did *not* shock the court's conscience. The original 1998 assignment was valid, and Motorola was a joint owner of the patent. As a joint owner, Motorola could not be liable for infringement of the patent. *MemoryLink Corp. v. Motorola Solutions. Inc.*, (Fed. Cir. Dec. 5, 2014) (No. 2014-1186, N.D. Ill.)

51. In such a relationship, there is always a contract between the parties, which, if it concerns full transfer of ownership or the granting of an exclusive license, must be reduced to writing. However, if it is not a full transfer of ownership it need not be reduced to writing. 17 U.S.C. § 204(a) (2000).

## MR. DIXON PROVIDED NOTICE OF TERMINATION OF LICENSE

52. Mr. Dixon terminated the contract with Prince. Conditions for termination other than a work for hire, exclusive or nonexclusive grant of a transfer or

license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination. (Copyright Law of the United States of America § 203(1)).

53. Mr. Dixon provided notice of the termination to the proper persons and entities as the original and joint-creator of works monetized by Prince Rogers Nelson in accordance with Copyright Law of the United States of America § 203.

## DEFENDANTS' UNLAWFUL ACTIVITIES

54. The Estate is engaged in the for-profit business of exploiting Prince's intellectual properties and collecting upon contracts for master recordings and intellectual properties performed by decedent Prince Rogers Nelson during his lifetime. The Estate is also challenged with paying creditor claims of decedent Prince Rogers Nelson, including contracts entered prior to his death. Although the Estate have been put on notice that Mr. Dixon terminated the license with Prince, the Estate continues to contract and collect monies on the Dixon songs without permission from Mr. Dixon and without payment to Mr. Dixon.

55. Mr. Dixon is informed and believes, and on that basis, alleges, that the Estate, either alone or with the assistance or support of the other Defendants, has contracted and exploited (and continues to seek and allow use) of the

Dixon songs unlawfully. The Estate has maintained that Mr. Dixon's claims are based on the use of Prince's creative works. However, Mr. Dixon has made it clear and evident that the contract is based on Mr. Dixon's own creative works and joint-works used by Prince.

56. Therefore, Mr. Dixon is informed and believes, and on that basis, alleges, that the Estate is engaged and continues to engage in a series of unlawful acts. The Estate has improperly or fraudulently obtained access to the Dixon songs, knowing and intending to violate Mr. Dixon's rights.  The Estate's representation that it is the personal representative for all "Prince's" intellectual properties and master recordings, listed in NPG Music Publishing, LLC, NPG Records, Inc., and the Vault, is fraudulent and deceptive, for the sole purpose of improperly gaining access to the Dixon songs, for the express purpose of engaging in unauthorized copying and distribution.

57. Specifically, Special Administrator, Bremer Trust, N.A. representing The Estate executed a "Resolutions of the Sole Member of NPG Music Publishing, LLC Adopted by Written Consent" document, determining Prince was sole member of NPG Music Publishing, LLC, and as such, the Estate is sole member headed by special administrator and personal representative [See **Exhibit J**].

58. However, Prince filed his contract with NPG Music Publishing, LLC in the Library of Congress, Copyright Office for 70 years' protection from such actions, that contradicts the interpretation rendered by special administrator and personal representative. Furthermore, the agreement refers to collaborative writers such as Mr. Dixon, who allowed his creative works to be administered by NPG Music Publishing, LLC with the intent to collect upon deferred royalty payments therewith. Notwithstanding, the Estate is barred from any entry of NPG Music Publishing, LLC therein. The Library of Congress, Copyright Filing titled '$ by Prince Rogers Nelson et al' and is part of Merc Supertext [See **Exhibit K**].

59. Mr. Dixon is informed and believes, and on that basis, alleges, that once in possession of the Dixon songs, the Estate engaged in multiple acts of unauthorized deals and/or distribution of Mr. Dixon's creative works. The Estate collected monies from the exploitation of the Dixon songs and have kept that money from Mr. Dixon. The Estate has allowed the Dixon songs to also be copied, and distributed and sold to consumers around the world. Such unauthorized acts of reproduction, distribution, and sales were made solely for enriching others outside of Mr. Dixon. Mr. Dixon has never authorized the Estate or any of the Defendants to engage in any of the

foregoing acts; to the contrary, such conduct is expressly prohibited by Mr. Dixon's Lifetime License to Prince which is terminated.

60. The Estate actively participates in the exploitation of the Dixon songs. For example, the Estate regularly communicates with the public and purchasers that it has full and exclusive use to the Dixon songs. This communication is in violation of the Dixon License and Prince's copyright filed contract.

61. The Estate understands its conduct is unlawful and in violation of the Dixon License to Prince, and that its conduct is causing ongoing harm to Mr. Dixon. Mr. Dixon's efforts to combat the Estate have been widely reported in the media. In fact, among the matters that have been widely discussed among the Prince fan base, including on message boards dedicated to Prince, are court decisions based on the misrepresentation that Mr. Dixon's claim is solely based on Prince's creative works transferred to Mr. Dixon, rather than Mr. Dixon's creative works used by Prince per agreement, although Mr. Dixon has cleared up any confusion the Estate could have, holding the Estate liable for violation Mr. Dixon's Copyrights, intentional interference with contract, and breach of contract.

## V. **CLAIMS**

## **CLAIM I**
### **(Copyright Infringement)**

62. Mr. Dixon realleges each allegation set forth in Paragraphs 1 through 61, inclusive, and incorporates them by reference herein.

63. Mr. Dixon is the owner of intellectual properties and master recordings "Purple Rain", "Around the World in a Day", "Sign O' The Times", "Emancipation", numerous compositions in "The Vault," and all titles specified by Prince in the Library of Congress, Copyright Office under '$ By Prince Rogers Nelson et al."

64. Defendants have infringed, and are continuing to infringe, Mr. Dixon's copyrights by reproducing, distributing, and/or authorizing others to reproduce, adapt, and distribute copyrighted elements of the Dixon songs without authorization, in violation of the Copyright Act, 17 U.S.C. § 101 et seq.

65. Mr. Dixon has never authorized or given consent to Defendants to use his copyrighted works in the manner complained of herein.

66. Defendants' acts of infringement are willful, in disregard of, and with indifference to the rights of Mr. Dixon.

67. As a direct and proximate result of the infringements alleged herein, Mr. Dixon is entitled to damages and to Defendants' profits in amounts to be

proven at trial, which are not currently ascertainable. Alternatively, Mr.

Dixon is entitled to maximum statutory damages of $150,000 for each

copyright infringed, or in such other amount as may be proper under 17

U.S.C. § 504(c).

68. Mr. Dixon is entitled to its full costs pursuant to 17 U.S.C. § 505.

69. Because of Defendants' acts and conduct, Mr. Dixon has sustained and will

continue to sustain substantial, immediate, and irreparable injury, for which

there is no adequate remedy at law. Mr. Dixon is informed and believe, and

on that basis, alleges, that, unless enjoined and restrained by this Court,

Defendants will continue to infringe Mr. Dixon's rights in the Dixon songs.

Mr. Dixon is entitled to temporary, preliminary, and permanent injunctive

relief to restrain and enjoin Defendants' continuing infringing conduct.

## CLAIM II
### (Intentional Interference with Contractual Relations)

70. Mr. Dixon realleges each allegation set forth in Paragraphs 1 through 69,

inclusive, and incorporates them by reference herein.

71. As described herein, Prince licensed Mr. Dixon's creative works in 1982,

submitted to Mr. Dixon's contract claims in 1995, extended the license in

1995 with $1 consideration paid, and secured deferred royalty payments to

Dixon via Library of Congress filing in the Copyright Office in 2016, three

(3) months before his death. Prince offered all agreements to Mr. Dixon with

$1 billion in deferred royalty payments, and Mr. Dixon accepted. Among other provisions, the Dixon License allowed Prince a lifetime use of Mr. Dixon's creative works and joint works, but license was terminated.

72. Prince's contracts with Mr. Dixon are valid and enforceable as an implied license.

73. Mr. Dixon is informed and believes, and on that basis, alleges, that Defendants are aware of the contracts between Mr. Dixon and Prince and additionally are aware of the Dixon License by Mr. Dixon's claims and preceding lawsuits.  Defendants specifically are aware that the Dixon License prohibits anyone other than Prince from usage except by expressed permission from Mr. Dixon.  Nevertheless, Defendants intentionally exploit the Dixon songs, knowing that the use of these products by their contractors is a breach of Prince's contract with Mr. Dixon.

74. By engaging licensors to breach the contract between Prince and Mr. Dixon, Defendants have intentionally interfered, and continue to interfere, with the contracts between Prince and Mr. Dixon.

75. Because of Defendants' actions, Mr. Dixon has suffered damage in an amount of $1 billion per contract terms, including but not limited to loss of goodwill in the entertainment and energy industries.

76. As a further result of Defendants' actions, Defendants have unjustly obtained specifically identifiable intellectual and real property, including but not limited to all the proceeds attributable to the sale of the Dixon songs, and any other products or services that violate any of Mr. Dixon's rights, and any additional property traceable to those proceeds.  Those proceeds, which are directly attributable to Defendants' manipulation and misuse of the Dixon songs and intentional interference with Mr. Dixon's contract with Prince, rightfully and equitably belong to Mr. Dixon.

77. Defendants' intentional interference with the contracts between Mr. Dixon and Prince entitles Mr. Dixon to injunctive relief and compensatory damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds, and other available relief.

78. Defendants are guilty of oppression, fraud, or malice, in addition to its actual damages, by reason thereof, and Mr. Dixon is entitled to recover exemplary and punitive damages against Defendants.

## <u>COUNT III</u>
### <u>(Breach of Contract)</u>

79. Mr. Dixon realleges each allegation set forth in Paragraphs 1 through 78 inclusive, and incorporates them by reference herein.

80. Defendants have acted as a special administrator and/or personal representative of the Estate of Prince Rogers Nelson, NPG Music

Publishing, LLC, NPG Music, Inc. and other Prince entities. Their fiduciary duty of the special administrator and personal representative of the Estate includes to "settle the estate," which includes the payment of debts owed and the reversion of intellectual properties. The fiduciary duty of the special administrator and/or personal representative, is not to misrepresent claims to avoid payment therewith. Therefore, the Estate is responsible for the payment of the contract between Prince and Mr. Dixon, in addition to Mr. Dixon's intellectual property reversion. The Dixon license restricts the contracting party from further use after the death of Prince Rogers Nelson without authorization from Mr. Dixon.

81. Defendants have breached the Dixon License, in violation of the laws of the United States of America and the State of California, by, among other things, creating, distributing, selling, and promoting the Dixon songs, as well as by exploiting Mr. Dixon's intellectual properties.

82. Because of Defendants' actions, Mr. Dixon has suffered damage in an amount of $1 billion, including but not limited to loss of goodwill in the entertainment and energy industries.

83. Defendants have breached and continue to breach the Dixon License, because of which Mr. Dixon has suffered and, unless Defendants are enjoined, Mr. Dixon will continue to, suffer harm and irreparable injury.

Mr. Dixon is entitled to the payment of his contract and reversion of intellectual properties, and/or temporary, preliminary and permanent injunctions prohibiting further acts of breach.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Mr. Dixon prays that this Court enter judgment in its favor on each claim for relief set forth above and award him relief, including but not limited to an Order:

1. Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all Mr. Dixon protected works; (ii) inducing or contributing to third party infringements of Mr. Dixon's protected works; (iii) intentionally interfering with Mr. Dixon's contracts with Prince; and (iv) violating the Dixon License.

2. Requiring Defendants to shut down any business dealings that exploit the Dixon songs thereof, including but not limited to hosting at any domain, address, location, or ISP within the jurisdiction of this Court.

3. Requiring Defendants to deliver to Mr. Dixon all copies of materials that infringe or violate any of Mr. Dixon's rights described herein.

4.  Requiring Defendants to provide Mr. Dixon with an accounting of all sales of products or services that infringe or violate any of Mr. Dixon's rights described herein.

5.  Awarding Mr. Dixon monetary relief including damages sustained by Mr. Dixon in the amount of $1 billion, including actual or statutory damages for copyright infringement and willful infringement under 17 U.S.C. §§ 504, as appropriate.

6.  Awarding Mr. Dixon his costs and attorneys' fees in this action pursuant to 17 U.S.C. §§ 505 and other applicable laws.

7.  Awarding such other and further relief as this Court may deem just and appropriate.

Dated: February 24, 2017          RODNEY H. DIXON
                                  PLAINTIFF IN PRO SE

                                  By: _____
                                  Rodney H. Dixon
                                  Plaintiff in Pro Se

## VII.   JURY DEMAND

Plaintiff Rodney H. Dixon. hereby demands a trial by jury on all matters and issues so triable.


Dated: February 24, 2017

RODNEY H. DIXON
PLAINTIFF IN PRO SE

By: _____
Rodney H. Dixon
Plaintiff in Pro Se



1   Ruth Anne Taylor, Att___, State Bar No. 130587
    WARNER BROS. RECORDS INC.
2   3300 Warner Boulevard
    Burbank, CA 91505
3   (818) 953-3290

4   Attorneys for Defendant
    WARNER BROS. RECORDS INC.

**FILED**
LOS ANGELES SUPERIOR COURT

OCT 12 1994

EDWARD M. KRITZMAN

BY ___ OTTOHO, DEPUTY

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| RAMSES AMERICA MERCURY, | CASE NO. BC 113 137 |
| Plaintiff, | NOTICE OF DEMURRER AND DEMURRER OF DEFENDANT WARNER BROS. |
| v. | RECORDS INC. TO PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS |
| PRINCE ROGERS NELSON, and WARNER BROS. RECORDS INC., | AND AUTHORITIES IN SUPPORT THEREOF |
| Defendants. | Date: November 16, 1994 |
| | Time: 8:30 a.m. |
| | Dept: 47 |

18     PLEASE TAKE NOTICE that on November 16, 1994 at 8:30 a.m., or

19   as soon thereafter as counsel may be heard, in Department 47 of the

20   above-named Court located at 111 North Hill Street, Los Angeles,

21   California 90012, Defendant Warner Bros. Records Inc. (hereinafter

22   referred to as "WARNER") will and does hereby demur to the first

23   and second purported causes of action of MERCURY's complaint herein

24   on the grounds that ____ purported causes of action fail to state

25   a cause of action, and ___ uncertain.

26     This Demurrer is based on this Notice ___ Demurrer, the

27   accompanying Demurrer and Memorandum of Po___ and Authorities, the

28   papers and pleading ___ file herein, and such other and further

1   oral and written evidence as may be received by the Court at the

2   time of hearing on this matter.

3

4   Dated: October 12, 1994          WARNER BROS. RECORDS INC.

5

6                                    By: _____

7                                        Ruth Anne Taylor,
                                         Attorneys for Defendant
8                                        WARNER BROS. RECORDS INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

37

28

1 | <u>DEMURRER OF DEFENDANT WARNER BROS. INC. TO PLAINTIFF'S COMPLAINT</u>

2 |     Defendant Warner Bros. Records Inc. (hereinafter referred to

3 | as "WARNER") hereby demurs to plaintiff's complaint on each of the

4 | following grounds:

5 |     <u>DEMURRER TO FIRST CAUSE OF ACTION:</u>

6 |     1.   The purported first cause of action fails to state facts

7 | sufficient to constitute a cause of action.  (C.C.P. § 430.10(e)).

8 |     2.   The purported first cause of action is uncertain.

9 | (C.C.P. § 430.10(f)).

10 |     <u>DEMURRER TO SECOND CAUSE OF ACTION:</u>

11 |     3.   The purported second cause of action fails to state facts

12 | sufficient to constitute a cause of action.  (C.C.P. § 430.10(e)).

13 |     4.   The purported second cause of action is uncertain.

14 | (C.C.P. § 430.10(f)).

15 |

16 | Dated: October 12, 1994

             WARNER BROS. RECORDS INC.

17 |

18 |

19 | By: _Ruth Anne Taylor_

20 |     Ruth Anne Taylor,
    Attorneys for Defendant
    WARNER BROS. RECORDS INC.

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

C:\DATA\WPDATA\PAISLEY\MERCURY\DMR10074.LO1
October 11, 1994          -3-          MERCURY V. NELSON, ET AL.
         L.A.S.C. CASE NO. BC 113 137

B

1  Ruth Anne Taylor, Atty., State Bar No. 130587
   WARNER BROS. RECORDS INC.
2  3300 Warner Boulevard
   Burbank, CA  91505
3  (818) 953-3290

4  Attorneys for Defendants
   WARNER BROS. RECORDS INC.

5

6

7



8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF LOS ANGELES

10

11 RAMSES AMERICA MERCURY,              )  CASE NO.   BC113137
                                        )
12             Plaintiff,               )  NOTICE OF RULING
                                        )
13        v.                            )  Date:  January 30, 1995
                                        )  Time:  8:30 a.m.
14 PRINCE ROGERS NELSON and WARNER      )  Dept:  47
   BROS. RECORDS INC. et al.            )
15                                      )
               Defendants.             )
16                                      )

17

18      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

19      PLEASE TAKE NOTICE THAT on January 30, 1995, at 8:30 a.m. in

20 department 47 of the above entitled court, defendant Warner Bros.

21 Records Inc. ("Warner") moved for dismissal of the complaint filed

22 by plaintiff Ramses America Mercury ("Mercury") on the grounds that

23 Mercury had failed to file an amended complaint within the 30 day

24 period following Warner's successful demurrer to his complaint.

25      Ruth Anne Taylor appeared on behalf of Warner.  Ramses America

26 Mercury appeared on behalf of himself.  Both parties submitted

27 pursuant to the terms of the court's tentative ruling.

28

1    After consideration of the pleadings and upon submission of

2  both defendants the honorable Aurelio Munoz ruled as follows:

3       1.   The complaint against Warner is dismissed.

4       2.   The initial status conference is taken off calendar.

5       3.   Warner shall submit a proposed order and give notice.

6                                    Respectfully submitted,

7                                    WARNER BROS. RECORDS INC.

8  Dated: February 2, 1995

9

10                                   By: _____
                                         Ruth Anne Taylor,
11                                       Attorneys for Defendant
                                         WARNER BROS. RECORDS INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   2

1 | Ruth Anne Taylor, State Bar No  130587
Warner Bros. Records Inc.
2 | 3300 Warner Blvd.
Burbank, Ca. 91505
3 | (818) 953-3290

**FILED**
FEB 0 6 1995
BY RUBY R. MAYA, DEPUTY

4 | Attorneys for Defendant WARNER BROS  RECORDS INC.

5

6

7 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

8

9

| 10 | RAMSES AMERICA MERCURY, | ) Case No. BC113137 |
| 11 | Plaintiff, | ) (~~PROPOSED~~)ORDER RE DISMISSAL |
| 12 | v. | ) DATE: January 30, 1995<br>) TIME: 8:30 a.m. |
| 13 | WARNER BROS. RECORDS INC., and<br>PRINCE ROGERS NELSON et. al, | ) DEPT: 47 |
| 14 | Defendants. | ) DISCOVERY CUT-OFF: None Set<br>) MOTION CUT-OFF:   None Set |
| 15 | | TRIAL DATE:       None Set |

16

17      Upon reading and considering the motion to dismiss complaint

filed by defendants Warner Bros. Records Inc. ("Warner") and the

18  exhibits thereto, and upon submission by both Ruth Anne Taylor,

19  counsel to Warner and Ramses America Mercury ("Mercury")and upon

20  determining that Mercury has not filed an amended complaint by

21  December 16, 1994:

22      IT IS HEREBY ORDERED THAT·

23      a.   The complaint is dismissed as to defendant Warner Bros.

24  Records Inc.

25  Dated: February 6, 1995

26  _____
                        Judge Aurelio Muñoz
27

28



## DECLARATION OF MICHAEL L. ARMSTRONG

As to the following facts, I know them to be true or I believe them to be true. If called upon, I could and would testify to the validity thereof.

1. I am an associate attorney with the law firm of Covington & Crowe, located at 1131 West Sixth Street in Ontario, California.

2. Covington & Crowe represented Plaintiff Rameses America Mercury in a case wholly unrelated to Plaintiff's lawsuit filed against Defendant Prince Rogers Nelson (hereinafter the "subject lawsuit"). Covington & Crowe does not represent Plaintiff in the subject lawsuit.

3. On or about March 24, 1995, Plaintiff telephoned me and requested my assistance in preparing a proof of service for his complaint in the subject lawsuit. I agreed, and directed a member of Covington & Crowe's staff to prepare both the proof of service and prepare Plaintiff's complaint for filing using address information provided by Plaintiff.

4. On or about April 18, 1995, I received a letter from attorney Jerry Edelstein. Prior to receiving this letter, I had never heard of Mr. Edelstein. Mr. Edelstein's letter did not include any written correspondence, but it did include another envelope which was sent via certified mail to Mr. Edelstein with my name and work address as the return address. Inside the envelope contained in Mr. Edelstein's letter was a $1.00 bill. Completely baffled, I called Mr. Edelstein's law office in an attempt to discover the purpose of the letter. After asking to speak with Mr. Edelstein, I was transferred to a woman who I assumed was Mr. Edelstein's secretary. She informed me that Mr. Edelstein was not available. I asked her if she had any idea why Mr. Edelstein would send me such a letter and $1.00. She stated that she remembered Mr. Edelstein instructing her to send the letter, but did not know why. We then began discussing the possibility of a common client or common legal conflict. She informed me that Mr. Edelstein's clients included recording artists. From my conversation with this woman, I realized for the first time that this letter involved the subject lawsuit.

5. I then telephoned Plaintiff and asked him if he had sent the letter. Plaintiff told me that he feared Mr. Edelstein would deny receiving the complaint. Based on this fear, Plaintiff sent the certified letter to Mr. Edelstein, using the exact address of the complaint. It turns out that Mr.

Edelstein would return the letter to the addressor, thereby establishing for this court that Mr. Edelstein received mail at the same address used to mail the complaint. He also explained that he used my name and work address in hopes that Mr. Edelstein would be more likely to return the letter if the addressor was an attorney and not the Plaintiff.

6.   On May 11, 1995, and upon Plaintiff's request, I telephoned Defendant's business entity (612) 474-8555, the telephone number provided me by Plaintiff. I informed the receptionist who answered the telephone that I am a California attorney and that I was attempting to assist a former client of mine in his pro per civil lawsuit against Defendant. I was transferred to Mr. Mike Caine. I asked Mr. Caine for the name, address, and telephone number of the agent authorized to receive legal process for Defendant Prince Rogers Nelson. Mr. Caine refused to provide the information, stating that "I am not going to help you sue us."

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of May 1995, in Ontario, California.

_____
Michael L. Armstrong

E

1    MERCURY has alleged that on February 14, 1994, he

2    "became the first American in history to be deemed a

3    subject of 'the Higher Authority' besides America

1    <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER</u>

2    I.

3    <u>INTRODUCTION</u>

4    On October 6, 1994, a plaintiff who describes himself as

5    "Pharaoh of the United States and Canada", "Future Pharaoh of the

6    World", "The Word of God", "The Messiah", and "Ramses XII" served

7    an unusual tome of quasi-legal pleadings on WARNER.  This package

8    of documents consists of an apparent verified complaint, several

9    news articles about Prince, a WARNER artist, a letter to Janet

10    Jackson, a copy of an adoption petition in which plaintiff sought

11    to be adopted by "God as his Father and Earth as his Mother", an

12    order for change of name, several disjointed declarations,

13    descriptions of the Pyramids of Giza and the Universal Church of

14    God Discovery System, a game of riddles and some poetry.

15    Despite its best efforts, WARNER has been unable to decipher

16    the specific claims and allegations plaintiff Ramses America

17    Mercury (hereinafter referred to as "MERCURY") is attempting to

18    assert in his complaint.  While MERCURY has designated his claims

19    as "fraudulent transfer or obligation" and "conspiracy", MERCURY

20    has, among other serious deficiencies, failed to assert against

21    which defendant each cause of action is stated.  More seriously,

22    however, it appears that MERCURY's claims, as a whole, may have

23    arisen in a world in which only MERCURY himself exists.  On this

24    basis alone, these claims should be dismissed without leave to

25    amend.

26    / / /

27    / / /

28    / / /

F

# http://funkyprince.net/lovesign/message-forever-prince/
# Welcome 2 the Dawn.
## U have just accessed the O(+> experience.

On December 22, Paisley Park issued a press release that read as follows:

" O(+>has officially given notice to Warner Bros. Records (WBR) of his desire to terminate his recording agreement with the company. Over the course of their nearly two decade long relationship, The Artist and WBR have developed irreconcilable differences. Most recently, the unstable and ever changing management structure within WBR has made it impossible for the company to effectively market and promote its flagship artists, including O(+>.

The Artist is prepared to deliver the three (3) remaining albums under his former name Prince which will fulfill his contractual to WBR. Currently, the albums are titled: Prince: The Vault — Volumes I, II and III.

O(+> will release a new recording entitled Emancipation once he is free from all ties with Time Warner."

The press release wasn't very detailed, but it outlined my feelings as the Holiday week approached. While it was a message to everyone, it was more for the ears of the entertainment industry, and specifically it was geared towards the music industry and its musicians — both young and old, green and seasoned, struggling and successful. These words from Paisley Park are from me. My ultimate message is a cry for solidarity amongst artists and a reprieve from the greed of entertainment executives.

My message stems from a lifetime of development as an artist and as a businessman, and my increasing awareness of a greedy structure within the music industry that unjustly rewards large, slow corporate management teams, while overlooking and not protecting its bread and butter — the artists.

As difficult as it is to admit now, when I began my career with Warner in 1978, I had a lot to learn. The transition into the artist I am now hasn't been a smooth one. I don't want other young artists to be mislead in the same way. I'm expressing my feelings so that others will learn from my mistakes. I also want all established artists to understand the issues and know that there should be a better way and to join with me to create that new path.

A little history.

At 37 years old, I have been a recording artist for Warner Music for what will be seventeen years this April. I was only 19 years old when I recorded my first album as Prince. Recording for a large label was new and exciting. I had an opportunity to reach millions of people around the world, not just my faithful following here in Minneapolis around the club scene. As time passed, the realities of the music industry and its current hierarchical pecking system sunk in. Artists are last on the totem pole in terms of recoupment.

My path has been a long and arduous one. In the beginning, both youth and excitement towards the opportunity to have an album produced made me, as Prince, naïve. Saavy lawyers claiming to have my interest at heart, long in bed

with the record companies they pimp, offered me what seemed to be a lucrative contract, without fully explaining the ramifications of its terms. I wrote an album a year for many years until I realized a trap had been laid. I would never be able to leave the legacy of my music to my family, my future children or anyone, because "Prince" did not own the Masters—I did not, and still do not, own my Art.

For most of all of my adult life, I have labored under one construct. I compose music, write lyrics, and produce songs for myself and others. My creativity is my life; it is what guides my everyday, my sleepless nights. My songs are my children. I feel them. I watch them grow and I nurture them to maturity. I deliver them to my record company, and suddenly, they are no longer mine. The process is painful. I have been long ready for a new program. The time is now.

As an artist, I want to share my music with others. I crave the experience of writing and sharing with others. It is what I do as an artist; as a human being. I take pleasure in the fact that others are able to share in my joy once the process is complete. My fans are my children's friends; I respect them and want to communicate with them.

---

As a businessman and the owner of NPG Records—the label that released The Most Beautiful Girl In The World—the 1994 Number One release by an independent, I realize that record companies are a natural part of the food chain. It is the record label that allows a musical artist to reach out to his or her audience, but that does not mean that whichever organization markets and distributes the music should own the final product, i.e. the Masters.

What I have learned as both an artist and a businessman is that a middle ground must be developed. All artists, whether new or established, must have a substantial ownership interest in the music they create. Conversely, all record labels need an incentive to market music and push it thorough their distribution systems; still, that incentive should not be ultimate control. Record labels have no right to enslave the creators.

The first step I have taken towards the ultimate goal of emancipation from the chains that bind me to Warner Bros. was to change my name from Prince to O(+>. Prince is the name that my Mother gave me at birth. Warner Bros. took the name, trademarked it, and used it as the main marketing tool to promote all of the music that I wrote. The company owns the name Prince and all related music marketed under Prince. I became merely a pawn used to produce more money for Warner Bros.

---

By my 35th birthday, June 7, 1993, I was beyond frustrated with my lack of control over my career and music. It seemed reminiscent of much that had been experienced by other African-Americans over last couple of hundred years. They had turned me into a slave and I wanted no more of it. The dilemma had only one clear solution. I was born Prince and did not want to adopt another conventional name. The only acceptable replacement for my name, and my identity, was O(+>, a symbol with no pronunciation, that is a representation of me and what my music is about. This symbol is present in my work over the years; it is a concept that has evolved from my frustration; it is who I am. It is my name.

I look forward to the release of Emancipation in the near future. It will be The Dawn of the next phase of my life as a musician. It will represent my freedom from the past and it will be a continuum of what I have started here today.

G

# Emancipation

**Emancipation** is the 19th full-length studio album by Prince (his third using the name ☥) and the first album to be released following the end of Prince's contract with Warner Bros., which ended less than a week prior to this album's release. It is also Prince's first released triple album. It was released worldwide in November 1996 (just four months after Chaos And Disorder).

**Recording process**

Prince (as ☥) began recording songs for the album in January 1995, and work continued on the album until October 1996. Two early configurations, from July 1995, and a later unknown date in 1995, are known, but both were single-disc sets and should be viewed as works-in-progress (see below for details).

The album was largely a solo work, although it also contains tracks showing Prince's transition from the 1993-5 version of The New Power Generation (with Michael B., Sonny T., Tommy Barbarella and Mr. Hayes) to the new, 1996, version of the band (containing Kirk Johnson, Rhonda Smith, Kat Dyson, Mr. Hayes and Eric Leeds).

The album is also Prince's first to include cover versions of others' songs (indeed the first commercial single release, Betcha By Golly Wow!, was a cover version). He has occasionally included cover versions on albums since Emancipation. Each of the album's three CDs contains 12 tracks and lasts exactly 60:00 - Prince mentioned in interviews that this was

planned based on his studies of Egypt, "the building of the pyramids and how the pyramids were related to the constellations. They were a message from the Egyptians about how civilization really started."

## Promotion

The album produced two commercially-released singles, Betcha By Golly Wow! and The Holy River. Eleven months prior to the album's release, Slave was given out as a cassette single to concert goers at a Paisley Park Studios show.

Additionally, following the album's release, Somebody's Somebody and Face Down were available as promotional releases. EMI Records went bankrupt during the album's promotional run, however, stalling all promotion for the album. Prince (as ♀) also independently released a live single, NYC, containing live versions of Jam Of The Year andFace Down.

Prince (as ♀) toured extensively to promote the album on the Love 4 One Another Charities Tour and the Jam Of The Year World Tour, although the tours focuses largely on past hits, with only a few songs from **Emancipation** played regularly. Prince (as ♀) also made multiple television appearances and media interviews to support the album, and labeled it "the album I was born to make".

The album reached number 11 on The Billboard 200, and number 6 on the Billboard Top R&B Albums Chart.



# Copyright

United States Copyright Office

This list contains titles in document V9914D228

Document title: $ and 964 titles.

The complete document is: V9914 D228 P1-47

List of titles:

001   $ / By Prince Nelson Rogers et al.

002   (There'll never B) another like me.

003   Back to the lotus.

004   '03 Bonnie & Clyde.

005   1+1+1 is 3.

006   100 miles an hour.

007   1000 X's & O's.

008   101.

009   17.

010   17 days.

011   18 and over.

012   1-800-New Funk ad.

013   1999.

014   1999 (acapella)

015   1999 (keep steppin')

016   1999 (Rosario)

017   1999 (Rosie Doug E in a deep house)

018   1999 (take)

019   1999 (The inevitable mix)

020   1999 (The new master)

021   2 nigs United 4 West Compton.

022   2 the wire.

023   2 Whom It May Concern.

024   200 balloons.

025   2045 radical man.

026   2045 radical man.

027   2gether.

028   2morrow.

029   2nite.



LIBRARY OF CONGRESS

Copyright Office
of the United States
WASHINGTON, D.C.

**THIS IS TO CERTIFY** that the attached is a true representation of the Document recorded in the Copyright Office Records in **VOLUME 9914 DOCUMENT 228** on February 4, 2016.

**THIS IS TO CERTIFY ALSO**, that due to the nature of the storage medium the attached photocopies are the best possible copies available.

**IN WITNESS WHEREOF**, the seal of this office is affixed hereto on August 30, 2016.

Maria A. Pallante
United States Register of Copyrights and Director

By:   Veronica Patten
Supervisory Copyright Specialist
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. Copyright law 17 U.S.C. 101 et seq.

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*Maria A. Pallante*

Register of Copyrights, United States of America

February 04, 2016
_____

Date Of Recordation

9914                                    228
_____

Volume                            Doc. No.

P 3104353475

**Form DCS** (Document Cover Sheet)
For Recordation of Documents

UNITED STATES COPYRIGHT OFFICE

Volume _____  Document _____

Volume _____  Document _____

Date of recordation    M ___ D ___ Y ___
(ASSIGNED BY THE COPYRIGHT OFFICE)

Funds received _____

Privacy Act Notice: Sections 205 and 705 of title 17 of the *United States Code* authorize the Copyright Office to collect the personally identifying information requested on this form in order to process the application for recordation. By providing this information, you are agreeing to routine uses of the information that include publication to give legal notice of your recordation pursuant to 17 U.S.C. §§ 205 and 705. The information will appear in the Office's online Public Catalog. If you do not provide the information requested, recordation may be refused or delayed, and you may not be entitled to certain relief, remedies, and benefits under the copyright law.

DO NOT WRITE ABOVE THIS LINE • SEE INSTRUCTIONS

To the Register of Copyrights: Please record the accompanying original document or its properly certified copy.

**1**  First party name given in the document
NPG MUSIC PUBLISHING, LLC

**2**  First title given in the document
S  [IMPORTANT: Please read instruction for this and other spaces.]

**3**  Total number of titles in the document    965

**4**  Return receipt requested
☐ If checked, please enclose a self-addressed postage-paid envelope.

**5**  Electronic title list enclosed
☐ If checked, please enclose an acceptable digital storage medium containing a properly formatted title list.

**6**  Amount of fee calculated    $4,050

**7**  Fee enclosed
☐ Check                    ☐ Money order
☑ Fee authorized to be charged to Copyright Office deposit account
Deposit account number  DA 57347
Deposit account name  Southern Music Publishing Company Inc., Peermusic

**8**  Completeness of document
☑ All attachments referenced in this document are included.
☐ One or more attachments referenced in this document is missing but (a) the attachment is completely unavailable for recordation; (b) the attachment is not essential to the identification of the subject matter of the document; and (c) it would be impossible or wholly impracticable to have the parties to the document sign or initial a deletion of the reference to the attachment.

**9**  Certification of photocopied documents
Complete this certification if a photocopy of the original signed document is being submitted instead of the document bearing the actual original signature.
NOTE: This space may not be used for documents that require an official certification.
I declare under penalty of perjury that the accompanying document is a true and correct copy of the original document.

signature _____    Date  1/8/16
Duly authorized agent of  NPG MUSIC PUBLISHING, LLC
Name  PHAEDRA ELLIS-LAMKINS

**10**  Return to
Number/street  1611 TELEGRAPH AVENUE          Apt/suite  600
City  OAKLAND          State  CA          Zip  94612
Phone number _____          Fax number _____
Email  DIANA@NPGMUSICPUBLISHING.COM

SEND TO: *Library of Congress, Copyright Office-DCS, 101 Independence Avenue SE, Washington, DC 20559-6000*
INCLUDE ALL OF THESE TOGETHER: (1) two copies of this form; (2) payment from a deposit account or by check/mo of Copyrights; (3) your document; (4) if a return receipt is requested, a self-addressed postage-paid envelope. (5) if a list, an acceptable digital storage medium containing a title list in the prescribed format.

FORM DCS    REVIEWED 11/2014    Printed on recycled paper

LG COPYRIGHT

0 048 019 992 3

# EXCLUSIVE SONGWRITER AGREEMENT

THIS AGREEMENT made and entered into as of April 4, 2014 by and between NPG Music Publishing, LLC ("Publisher") and Prince R. Nelson, doing business individually and doing business under any fictitious publishing business names, including but not limited to Controversy Music, GIRLSONGS, Tionna Music, NPG Publishing, White Fox, and Emancipated Music. (collectively, "Writer").

The parties agree as follows:

1. **EMPLOYMENT:** Publisher employs Writer to render Writer's services as a songwriter and composer. Writer accepts such employment and agrees to render such services exclusively for Publisher during the Term.

2. **TERM:** The "Term" of this agreement shall consist of an initial term and at Publisher's election, to renewal term(s) provided below. The initial term of this Agreement shall commence as of April 4, 2014 and shall continue for a period of five (5) years. Writer grants to Publisher two (2) separate and irrevocable options, each to renew this Agreement for a five (5) year term, such renewal terms to run consecutively beginning at the expiration of the initial term hereof, all upon the same terms and conditions as are applicable to the initial term. Each option shall be exercised automatically, provided that Publisher does not notify Writer at any time prior to the commencement of the renewal term that Publisher elects not to exercise the option. Notwithstanding any of the foregoing to the contrary, Publisher and Writer may mutually decide to terminate the Term at any time.

3. **GRANT OF RIGHTS:** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Writer hereby irrevocably and absolutely assigns, conveys and grants to Publisher, its successors and assigns (a) all rights and interests of every kind, nature and description in and to all original musical compositions and all original arrangements of musical compositions in the public domain which have heretofore been written, composed or created by Writer, in whole or in part, alone or in collaboration with others, including but not limited to the titles, lyrics and music thereof and all world-wide copyrights and renewals and extensions thereof under any present or future laws throughout the world, including without limitation, those musical compositions listed on Schedule 1 of Exhibit A to this Agreement; and (b) all rights and interests of every kind, nature and description in and to the results and proceeds of Writer's services hereunder, including but not limited to the titles, lyrics and music of all original musical compositions and of all original arrangements of musical compositions in the public domain and all world-wide copyrights and renewals and extensions thereof under any present or future laws throughout the world, which shall be written, composed or created by Writer during the term hereof, in whole or in part, alone or in collaboration with others; and (c) all rights and interests of every kind, nature and description in and to all original musical compositions and all original arrangements of musical compositions in the public domain which are now directly or indirectly owned or controlled by Writer, in whole or in part, alone or with others, or the direct or indirect ownership or control of which shall be acquired by Writer during the term hereof, in whole or in part, alone or with others, as the employer or transferee of the writers or composers thereof or otherwise, including the titles, lyrics and music thereof and all world-wide copyrights

productions, in commercial advertisements, in computer software devices, and in merchandise.

(f) To print, publish and sell, and to license others to print, publish and sell, sheet music, orchestrations, arrangements and other editions of the Compositions in all forms, by any means, and in any and all media, now known or hereafter devised including, without limitation, the inclusion of any or all of the Compositions in song folios, compilations, song books, mixed folios, personality folios and lyric magazines with or without music.

(g) To authorize the digital or electronic reproduction or distribution of the Compositions by any means or method including, without limitation, by way of the Internet, satellite or otherwise and in any and all media now known or hereafter devised.

(h) Any and all other rights now or hereafter existing in all Compositions under and by virtue of any common law rights and all copyrights and renewals and extensions thereof including so-called small performance rights.

4. EXCLUSIVITY: During the term of this Agreement, Writer shall not, without Publisher's consent, write or compose, or furnish or convey, any musical compositions, titles, lyrics or music, or any rights or interests therein, nor participate in any manner with regard to same, for or to any party other than Publisher, nor permit the use of his name or likeness as the writer or co-writer of any musical composition by any party other than Publisher.

5. WARRANTIES, REPRESENTATIONS, COVENANTS AND AGREEMENTS: Writer hereby warrants, represents, covenants and agrees as follows to the best of Writer's knowledge and belief: Writer has the full right, power and authority to enter into and perform this Agreement and to grant to and vest in Publisher all rights herein set forth, free and clear of any and all claims, rights and obligations whatsoever.

6. POWER OF ATTORNEY: Writer hereby irrevocably authorizes, empowers and appoints Publisher or any of its officers Writer's true and lawful attorney (with full power of substitution and delegation), in Writer's name, and in Writer's place and stead, or in Publisher's name, to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments or documents, which Publisher from time to time may deem desirable or necessary to vest in Publisher, its successors and assigns, all of the rights or interests granted by Writer hereunder, including, without limitation, such documents as Publisher shall deem desirable or necessary to secure to Publisher, its successors and assigns, the worldwide copyrights for all Compositions for the entire term of copyright and for any and all renewals and extensions under any present or future laws throughout the Universe. The foregoing Power of Attorney is irrevocable and deemed coupled with an interest.

7. COMPENSATION:

(a) Conditioned upon, and in consideration of Writer's full and faithful performance of all of the terms and provisions hereof, Publisher shall pay to Writer, upon full execution of this Agreement, the sum of $1.00, and such other compensation as Publisher and Writer may

and renewals and extensions thereof under any present or future laws throughout the world; all of which, to the best of Writer's knowledge and belief, are and shall at all times be Publisher's exclusive property as the sole owner thereof, free from any adverse claims or rights therein by any other party (all such musical compositions and arrangements hereinafter being referred to as "Compositions"). Writer further grants to Publisher and its successors, licensees and assigns the right to use Writer's professional and personal name(s), likenesses and distinctive logos for all purposes contemplated hereunder and for Publisher's general marketing and goodwill, including without limitation, in connection with any websites or other social media platforms that concern Writer's songwriting services and/or the Compositions.

Without limiting the generality of the foregoing, Writer acknowledges that the rights and interests hereinabove set forth include but are not limited to Writer's irrevocable grant to Publisher, its successors, licensees and assigns, of the sole and exclusive right, license, privilege and authority throughout the entire Universe to exercise all rights with respect to all Compositions, whether now in existence or whether created or arising during the term hereof, including but not limited to, as follows:

(a) To perform and license others to perform the Compositions publicly or privately, for profit or otherwise, by means of public or private performance, radio broadcast, television, electronic and/or digital transmission, or any and all other means and media, whether now known or hereafter conceived or developed and to register the Compositions with one or more performing rights organizations, or to refrain therefrom.

(b) To substitute a new title or titles for the Compositions or any of them and to make any arrangement, adaptation, translation, dramatization or transposition of any or all of the Compositions or of the titles, lyrics or music thereof, in whole or in part, and in connection with any other musical, literary or dramatic material, and to add new lyrics to the music of any Compositions or new music to the lyrics of any Compositions, all as Publisher may deem necessary or desirable in its best business judgment.

(c) To secure copyright registration and protection of the Compositions in Publisher's name or otherwise, as Publisher may desire, at Publisher's own cost and expense, and at Publisher's election, including any and all renewals and extensions of copyright under any present or future laws throughout the world, and to have and to hold said copyrights, renewals and extensions and all rights existing thereunder, for and during the full term of all said copyrights and all renewals and extensions and all rights existing thereunder, for and during the full term of all said copyrights and all renewals and extensions thereof.

(d) To make and/or authorize the making of mechanical and/or electronic reproductions of the Compositions in and as part of master recordings, computer software, and any and all other audio only and/or audio visual devices whether now in existence or as hereafter devised.

(e) To authorize the synchronization of the Compositions in audio visual productions including, without limitation, in the soundtracks of motion pictures, in television

hereafter agree.

(b) Writer shall be entitled to receive his writer's share of public performance royalties throughout the world directly from the performing rights society with which he is affiliated, if any (or directly if he is unaffiliated), and shall have no claim whatsoever against Publisher for any royalties received by Publisher from any performing rights society which makes payment directly (or indirectly other than through Publisher) to writers, authors and composers., If, however, Publisher shall collect both the Writer's and Publisher's share of performance income directly and such income shall not be collected by Writer via his public performance society or otherwise, then, unless Publisher and Writer otherwise agree, Publisher shall pay to Writer fifty percent (50%) of all such net sums which are received by Publisher in the United States from the exploitation of such rights in the Compositions, throughout the world.

(c) For clarification, unless Publisher and Writer otherwise agree, no other monies shall be due to Writer in connection with the Compositions hereunder.

~~8. WRITER'S SERVICES: Unless Publisher and Writer otherwise agree, Writer shall perform the required services hereunder conscientiously, and solely and exclusively for and as requested by Publisher. Writer is a writer for hire hereunder within the meaning of the U.S. Copyright Act, and all Compositions are acknowledged by Writer to be "works made for hire" for Publisher. Writer shall duly comply with all requirements and requests made by Publisher in connection with its business as set forth herein.~~

9. **ACTIONS:** Publisher shall have the exclusive right to take such action as it deems necessary, either in Writer's name and/or in its own name or in both names, against any party to protect all rights and interests acquired by Publisher hereunder.

10. **ASSIGNMENT:** Publisher shall have the right to assign this Agreement or any of its rights and/or obligations hereunder to any party. Writer may not assign any of Writer's obligations hereunder without Publisher's consent.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

NPG Music Publishing, LLC (Publisher)

By

Prince R. Nelson
Member-Manager

PRINCE R. NELSON (Writer)

EXHIBIT A

COPYRIGHT ASSIGNMENT

FOR GOOD AND VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Prince R. Nelson d/b/a Controversy Music ("Assignor") hereby irrevocably transfers and assigns to NPG Music Publishing, LLC ("Assignee"), in perpetuity, all right, title, and interest, throughout the world, including any copyrights and renewals or extensions thereto, in and to all original musical compositions and all original arrangements of musical compositions in the public domain which have heretofore been written, composed or created by Assignor, in whole or in part, alone or in collaboration with others, including but not limited to the titles, lyrics and music thereof and all world-wide copyrights and renewals and extensions thereof under any present or future laws throughout the world, including without limitation, those musical compositions listed on the attached Schedule I.

Assignor has duly executed this Assignment as of April 4, 2014.

Prince R. Nelson d/b/a/ Controversy Music ("Assignor")

By: _____
     Prince R. Nelson

By

Prince R. Nelson
An Individual

# PRINCE ROGERS NELSON OBITUARY

6/7/1958 - 4/21/2016|



Prince (Getty Images / Michael Caulfield)

Prince Rogers Nelson, the musical superstar known better simply as Prince, died April 21. He was 57.

One of the best-selling musicians of all time, a singer, songwriter, and multi-instrumentalist, Prince won seven Grammy awards, a Golden Globe, and an Academy Award. Songs including "When Doves Cry," "Raspberry Beret," and "Kiss" soared to popularity and became pop-culture staples, widely known by fans of all genres of music. His broad appeal was due in part to the eclectic combinations of styles he created as he made his music, melding rock and R&B, jazz and funk, hip-hop and disco in a highly listenable – and danceable – mélange.

Born June 7, 1958, in Minneapolis, Minnesota, Prince was the son of musicians and was writing and performing music from his earliest years. By the time he was in high school, he and friends had formed the band Grand Central. His first recordings were with another band, 94 East, but by 1976, Prince had his own representation and soon was recording as a solo artist.

Prince's rise to stardom began with his debut album, "For You," with the lead single, "Soft and Wet," making a moderately strong debut on R&B radio and cracking the Billboard Hot 100 at No. 92. A second, self-titled album went platinum and yielded two more popular singles, "Why You Wanna Treat Me So Bad?" and "I Wanna Be Your Lover." Prince's crossover potential was rising, as he made it to the top 20 of the Hot 100 and performed on "American Bandstand" in 1980.

1982 and '83 saw a lead-up to Prince's greatest fame, as he cracked the Top 10 with popular singles from his "1999" double album: The title track, "Delirious," and "Little Red Corvette" were widely played on pop and soul radio, and the video for the latter single was one of the first by an African-American artist to reach heavy rotation on MTV.

If "1999" was popular, its follow-up, "Purple Rain," was explosive. The 1984 album accompanied a movie of the same name, in which Prince starred in his film debut. The dual offering helped Prince virtually dominate the pop culture of the year, with the album sitting at the top of the charts for 24 weeks and yielding hit after hit. The movie won an Academy Award for best original song score and was both successful at the box office and an enduring favorite among fans of rock musicals.

Following the life of a young singer known as "The Kid," the movie "Purple Rain" afforded plenty of space for great musical performances by Prince and others. Many of those songs were hit singles. The title track became one of Prince's signature songs, widely played in concert for much of his career. "When Doves Cry" became Prince's first No. 1 single. "Let's Go Crazy" also soared to the top of the charts, memorable for its preacherlike, spoken-word intro that led into a purely fun dance track. "Take Me With U" and "I Would Die 4 U" were also popular singles from the soundtrack.

As the wild popularity of "Purple Rain" brought Prince's music into more homes than ever before, it also drew attention to his provocative lyrics. The sexually explicit song "Darling Nikki," though not the first of its kind recorded by Prince, was perhaps his most notorious. Reportedly, it was this song that prompted Tipper Gore to found the Parents' Music Resource Center – the committee that called for "Parental Advisory" stickers to be placed on albums with sexual, violent, or drug-related content – after hearing her preteen daughter listening to the song. "Darling Nikki" came to top the center's "Filthy 15" list of songs they found most offensive, along with radio hits including Madonna's "Dress You Up" and Twisted Sister's "We're Not Gonna Take It."

The center's condemnation of Prince ultimately had the opposite effect of what its founders intended – rather than hampering his career, it seemed to help shoot it into the stratosphere. He and his backing band, the Revolution, followed "Purple Rain" with "Around the World in a Day," featuring enduring hit "Raspberry Beret," and "Parade," with the No. 1 single "Kiss." In 1986, he starred in a second movie, "Under the Cherry Moon," which he also directed.

As the late 1980s waned and the 1990s began, Prince continued to release popular albums and singles, including "Sign o' the Times" and "Batdance." He also continued developing a persona that would become as well-known as his music. Beginning with his early 1980s recordings, Prince offered a flamboyant yet reserved face to the world. Dressing wildly and spelling song and album titles in his own unique shorthand, he kept fans equally intrigued and confused as he both courted and shunned the spotlight, a superstar who was an extrovert onstage but shy in person.

Prince fanned the flames around his persona when, in 1993, he announced that he would no longer be called Prince, changing his name to an unpronounceable symbol in a reaction to what he called slave like treatment by his record label, Warner Bros. His statement on the matter included the explanation, "The first step I have taken toward the ultimate goal of emancipation from the chains that bind me to Warner Bros. was to change my name from Prince to the Love Symbol. Prince is the name that my mother gave me at birth. Warner Bros. took the name, trademarked it, and used it as the main marketing tool to promote all of the music that I wrote. The company owns the name Prince and all related music marketed under Prince. I became merely a pawn used to produce more money for Warner Bros."

When circumstances dictated that people had to call him something they could pronounce, he agreed to be called "The Artist Formerly Known as Prince," but Warner Bros. helped print-media outlets by mailing them floppy disks with a custom font, including the moniker that became known as "Love Symbol No. 2." Prince's popular singles during this in period included "The Most Beautiful Girl in the World" and "I Hate U." He maintained his used of the Love Symbol as his moniker until 2000, when he announced that with the expiration of his contract with Warner Bros., he would readopt the name Prince.

Prince had seen his last No. 1 single in 1989 with "Batdance," but his status as a pop icon only increased despite his waning popularity on the charts, and he continued to record prolifically throughout his life. He leaves behind a legacy including dozens of studio albums as well as live recordings and movies. Also important to his legacy is the work he did to encourage the careers of other artists, particularly the female protégées with whom he was both romantically and musically linked, including Sheila Escovedo, Apollonia Kotero, and Denise "Vanity" Matthews. He also wrote songs made famous by other artists, including the Bangles' "Manic Monday" and Sinead O'Connor's "Nothing Compares 2 U."

Prince's death came as a great shock to fans and colleagues, coming at a relatively young age and with little warning. A week before his death, news broke that a plane on which he was traveling landed briefly in Illinois, where he received medical treatment for the flu at a hospital and was released after a short time. But there was no other indication of a severe illness until news broke Thursday morning of a death at his Paisley Park estate near Minneapolis. Soon after that initial news, it was confirmed that it was Prince himself who died, though the cause of death is not yet clear.

Prince was immediately and widely mourned on social media, with expressions of

disbelief sharing space with memories of his unforgettable music and personality. Lenny Kravitz posted an early photo of Prince on Instagram, commenting, "My musical brother... My friend... The one who showed me the possibilities within myself, changed everything, and kept his integrity until the end, is gone. I am heartbroken." Spike Lee offered Instagram a photo of himself along with the musician, captioned, "I Miss My Brother. Prince Was A Funny Cat. Great Sense Of Humor." Justin Timberlake tweeted, "Numb. Stunned. This can't be real." Whoopi Goldberg was among several who declared, quoting Prince's 1984 hit, "This is what it sounds like when doves cry."

Prince was married twice, with both relationships ending in divorce. His one child, Boy Gregory, was born in 1996 with Pfeiffer syndrome, a rare genetic disorder, and died a week after his birth. Prince is survived by several brothers and sisters.

Filed in First Judicial District Court
2/6/2017 8:44:30 AM
Carver County, MN

## RESOLUTIONS OF THE SOLE MEMBER

## OF NPG MUSIC PUBLISHING, LLC

## ADOPTED BY WRITTEN CONSENT

**INASMUCH** as Section 17704.07(n) of the California Revised Uniform Limited Liability Company Act (the **"Act"**) provides that the members of a limited liability company may take action through a written consent without a meeting, if the members required to approve the action consent in writing and applicable notice requirements are followed;

**NOW THEREFORE**, the undersigned, being the Special Administrator of the sole member of NPG Music Publishing, LLC, a California limited liability company (the **"Company"**), record that effective as of the 27th day of April, 2016, hereby adopts the following resolutions and waives any applicable notice requirements associated with the resolutions:

### INTRODUCTION

**WHEREAS**, Prince Rogers Nelson was the sole member of the Company, and died on April 21, 2016 without a known will or testament or Personal Representative;

**WHEREAS**, on April 26, 2016, a Petition for Formal Appointment of a Special Administrator was filed in the Carver County District Court, State of Minnesota (**"Court"**) requesting that Bremer Trust, National Association (**"Bremer"**), be appointed Special Administrator to, among other things, manage and supervise Mr. Nelson's business interests, and Bremer accepted such appointment;

**WHEREAS**, on April 27, 2016 Court Judge Kevin Eide signed an order granting the petition for Bremer to serve as Special Administrator with the full power of a general personal representative and without any restrictions upon the foregoing, to preserve the estate of Mr. Nelson and secure its proper administration; and

**WHEREAS**, the Special Administrator desires to, among other things, modify the management structure of the Company to best exercise its power and authority on behalf of Mr. Nelson's estate.

**NOW, THEREFORE, BE IT RESOLVED**, that to the extent the Company has not elected to be Manager-Managed pursuant to Section 17704.07 of the Act, the Special Administrator shall hereby assume all of the responsibilities of Mr. Nelson as the sole member of the Company pursuant to the Act.

**RESOLVED FURTHER**, that to the extent the Company has elected to be Manager-Managed pursuant to the Act, Special Administrator in its capacity as sole member hereby removes any existing Manager of the Company, effective as of the date of this Written Action, and appoints the Special Manager the sole manager of the Company.

10-PR-16-46

Filed in First Judicial District Court
2/6/2017 8:44:30 AM
Carver County, MN

**RESOLVED FURTHER**, in its capacity either as sole Member or sole Manager, Special Administrator hereby removes any existing Officer of the Company, effective as of the date of this Written Action, and appoints the Special Administrator the sole officer of the Company.

**RESOLVED FURTHER**, that to the extent the foregoing resolutions require an amendment to any existing and effective Company Operating Agreement, the Special Administrator hereby approves an amendment to the Operating Agreement to permit the resolutions.

**RESOLVED FURTHER**, that to the extent the Articles of Organization of the Company require an amendment to permit the foregoing resolutions, the Special Administrator hereby adopts and approves any such amendment to the Articles of Organization.

**RESOLVED FURTHER**, that no individual, entity or other person shall have authority to act on behalf of the Company in any capacity unless expressly appointed by the Special Administrator, and the scope of that Company authority shall be strictly limited to the Special Administrator's appointment.

**RESOLVED FURTHER**, that the Special Administrator, in its role as Member, Manager, or Officer, as applicable, shall immediately take such actions and appoint agents as reasonably necessary to protect the assets of the Company, including but not limited to obtaining insurance policies, hiring or otherwise obtaining security services on behalf of the Company, and relocating Company assets.

**RESOLVED FURTHER**, that the Special Administrator is hereby authorized, directed and empowered to execute and deliver any required documents on behalf of the Company and take such action from time to time on behalf of the Company as it may deem necessary or advisable in order to carry out and perform these resolutions, such execution or action to be conclusively evidenced by the approval of any authorized individual employed by or otherwise providing approved services to the Special Administrator.

**RESOLVED FURTHER**, all of the acts of the Special Administrator and its agents in carrying out and promoting the purposes, objects and interests described in these resolutions are hereby approved, ratified and made the acts and deeds of this Company.

*Signature Page Follows*

10-PR-16-46

Filed in First Judicial District Court
2/6/2017 8:44:30 AM
Carver County, MN

IN WITNESS WHEREOF, the undersigned party has executed this Written Consent effective as of the date written above.

BREMER TRUST, NATIONAL ASSOCIATION

By: *Deborah J Fasen*

Its: *Ass't Vice President*



```
Type of Work:        Text

Registration Number / Date:
                     TXu000704673 / 1995-09-13

Title:               Rameses XII : Merc supertext : a handy manual for the
                        serious student of spirituality.

Description:         1 v.

Copyright Claimant:
                     Rameses America Mercury, 1962-

Date of Creation:    1995

Previous Registration:
                     Prev. reg. 1991, SR 140-130 as Queen Hottie.

Basis of Claim:      New Matter: compilation & additions.

Variant title:       Rameses XII : Merc supertext

Other Title:         Queen Hottie

Names:               Mercury, Rameses America, 1962-
```

===============================================================================